ANGELA M. ALIOTO (SBN 130328)
STEVEN L. ROBINSON (SBN 116146)
ALDEN KNISBACHER (SBN 169705)
JORDANNA THIGPEN (SBN 232642)
**LAW OFFICES OF JOSEPH L. ALIOTO
AND ANGELA ALIOTO**
700 Montgomery Street
San Francisco, CA  94111-2104
Telephone: (415) 434 8700
Facsimile: (415) 438-4638

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

BRENDA BARROS, KIM C. LYNCH, DELLFINIA HARDY, RACHELL EVANS, DARLENE DAEVU, JO-THERESA ELIAS-JACKSON, CHERYL THORNTON, DONNA JAMES,

                    Plaintiffs,

   vs.

CITY & COUNTY OF SAN FRANCISCO,

                  Defendants.

Case No.

**COMPLAINT FOR**

1. **Racial Discrimination in Employment Disparate Treatment – 42 U.S.C. § 1983;**
2. **Racial Discrimination in Employment Hostile Work Environment – 42 U.S.C. § 1983;**
3. **Racial Discrimination in Employment –Disparate Impact – 42 U.S.C. § 1983;**
4. **Racial Discrimination in Employment – Retaliation – 42 U.S.C. § 1983;**
5. **Disparate Treatment – Race/National Origin – Title VII;**
6. **Race/National Origin Discrimination – Disparate Treatment – California FEHA;**
7. **Age Discrimination – Disparate Treatment – California FEHA;**
8. **Harassment – Race – California FEHA;**
9. **Harassment – Age – California FEHA;**
10. **Failure to Prevent Employment Discrimination & Harassment – California FEHA;**
11. **Retaliation – California FEHA; and**
12. **Retaliation for Medical Whistleblowing – California Health & Safety Code § 1278.5**

**JURY TRIAL DEMANDED**

**COMPLAINT**

**INTRODUCTION**

1.      This is a case involving a toxic workplace culture in which discrimination, harassment, and retaliation have become unlawfully commonplace.  Eight loyal and hard-working, longstanding Black female employees of the City and County of San Francisco Department of Public Health, with a combined 199 years of experience between them, have been treated unfairly and retaliated against for exercising their rights under federal and California law.  Plaintiffs have been intentionally deprived of freedom from discrimination, a serious affront to personal liberty, and subjected to retaliation and harassment in the various forms of adverse employment actions described herein as to each individual, including but not limited to: (a) denial of necessary training; (b) denial of training opportunities; (c) denial of promotions; (d) substandard performance reviews; (e) denial of permission to work from home; (f) increased work load compared to non-Blacks; (g) being required to "work out of class," (i.e., perform higher level work than called for in the official job description but not receiving the pay at a level commensurate with the level of work performed; (h) denied opportunities to earn "stand by" pay accorded to co-workers;  (i) unjustified discipline; and (j) being required to work and assigned more hazardous work than those not in their protected class.

2.       Plaintiffs seek relief pursuant to 42 U.S.C. § 1983, Title VII, the California Fair Employment and Housing Act, Cal. Gov. Code § 12940 et seq., ("FEHA") and Health and Safety Code § 1278.5 (Retaliation for Medical Whistleblowing).

**PARTIES & JURISDICTION**

3.      Plaintiffs are eight Black women who are employed in various capacities by the Defendant City and County of San Francisco in the San Francisco Department of Public Health.

4.      Each of the Plaintiffs is over the age of 39 years.

5.     Defendant City and County of San Francisco ("CCSF" or "City") is a charter city organized under California law and subject to jurisdiction within the Northern District of California in the San Francisco Division of this Court.  Subject matter jurisdiction in this Court is invoked pursuant to 28 U.S.C. § 1331 on the grounds that there is a substantial federal question.  Specifically, the Plaintiffs herein assert that they have been discriminated against on the basis of their race in violation of 42 U.S.C. § 1983 and one of the Plaintiffs herein seeks redress pursuant to Title VII of the United States Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e)-5(f)(30).

6.     This Court has supplemental jurisdiction over Plaintiffs' state claims for relief arising out of the same case or controversy as the civil action over which this Court has original jurisdiction.  28 U.S.C. § 1367(a).

7.     The unlawful employment practices described herein were committed in the Northern District of California.

8.     Plaintiffs are informed and believe and thereon allege that the claims asserted herein are not preempted by the California Workers' Compensation Act as the wrongful acts alleged herein are not risks of employment.

9.     Where applicable, Plaintiffs have fully exhausted their statutory administrative remedies.

## STATEMENT OF FACTS

### A.     DEFENDANT CCSF'S FRAUDULENT REPRESENTATIONS TO BLACK EMPLOYEES

10.     San Francisco Civil Service Commission Rules establish extensive and far-reaching provisions against harassment, retaliation, and discrimination in employment. CCSF's county-wide provisions (which are applicable to the Department of Public Health) are broader in scope than State and Federal law concerning these same subjects.

However, the Department of Public Health has proceeded as if these rules do not apply to it.

11.     Defendant has, over a period of many years, been the subject of many claims of race discrimination for its unlawful employment practices (including but not limited to claims of racial discrimination and harassment related to hiring, workplace, and discipline).  For example, Officers for Justice, a black police officers' association within the San Francisco Police Department brought a class-action lawsuit against the City alleging discrimination based on race and sex. *See Officers for Justice v. Civil Service Comm'n* (N.D. Cal. 1979) 473 F. Supp. 801, aff'd (9th Cir. 1982) 688 F.2d 615 cert. denied, (1983) 459 U.S. 1217.  In that case, the court issued preliminary relief against the City and ordered quotas for hiring.  The case eventually settled with a consent decree.  In the late 1980s the United States sued Defendant City for its discriminatory practices in hiring firefighters.  In an opinion approving the settlement and consent decree, Judge Patel stated "San Francisco has long prided itself on its reputation for celebrating rather than discriminating on the basis of human diversity."  *United States v. City and County of San Francisco* (1988) 696 F.Supp.1287, 1305.

12.     However, since that time, hundreds of plaintiffs working in dozens of departments have sued the City for race discrimination, harassment, and retaliation over the past 30 years.  The San Francisco Examiner reported on March 21, 2019 that from January 1, 2007 to December 14, 2018 alone, there were at least 55 racial discrimination lawsuits that were settled or resulted in other awards. There is a pattern and practice to discriminate against Black people in the City and county of San Francisco.

13.     Since 2018, there have been two public audit hearings on discrimination, harassment, and retaliation at the Board of Supervisors of the City and County of San Francisco.  At one of these hearings, a November 26, 2018, hearing entitled "African-

American Workforce Hiring, Retention, and Promotional Opportunities – Workplace Discrimination and Complaints" about serious disparate treatment and systemic racism against Black employees, former San Francisco Department of Human Resources Director Micki Callahan stated that with regards to treatment of Black employees; "We really don't track bullying, because it's kind of an amorphous claim."  Of course, what Callahan failed to specify is that Defendant City does not track allegations of bullying (aka harassment) against Black employees.  At this time, former San Francisco Department of Human Resources Director Micki Callahan is still serving in her post.  At the hearing, Ms. Callahan admitted that in June 2019, Black employees demanded Callahan's termination. But she never addressed these employees at all.

14.      Although there have been numerous ad hoc and formal committees created by employees, with Defendant City's knowledge and participation, to attempt to redress the problem.  Defendant has falsely promised to redress the specific discrimination faced by Black employees, but has not done so and did not intend to so when making that promise.  Defendant City has misrepresented that it will address discrimination faced by Black employees, but has not done so and does not intend to do so.

15.      In a 2020 Annual Workforce Report released by the San Francisco Department of Human Resources and the Office of Racial Equity, Defendant City admitted to "serious disparities between demographic groups, particularly along racial lines.  Most notably, in comparison to those of other races, our Black employees have lower-paying jobs, are less likely to be promoted, and are disciplined and fired more frequently." In other words, CCSF admits to a systemic problem with the precise conduct experienced by the eight plaintiffs in this lawsuit.  Just some of the notable findings from the report include (1) "Blacks are the lowest paid PCS [Permanent Civil Service] employees, and among the lower paid PEX [Permanent Exempt, i.e.,

management] employees." There is no excuse for this disparate treatment and it has no legitimate purpose whatsoever.

16.     Over a period of years, CCSF has falsely promised to comply with the California Fair Employment and Housing Act (among other laws protecting Plaintiffs from discrimination, harassment, and retaliation), and yet, its treatment of Black employees says otherwise. Defendant City has failed to remedy or even address the discriminatory effects of employment actions which have fallen disproportionately on Black employees, such that Defendant City has failed to protect Black employees from experiencing discrimination despite promises to the contrary.  CCSF has established policy after policy, working group after working group, and now, an "Office of Racial Equity" – all window dressing, because the City has refused to take action to address discrimination in its workplace. Defendant City has meaningfully, repeatedly, and intentionally failed to stop discrimination and harassment, and discrimination against and harassment of these Plaintiffs (not to mention thousands of other Black employees) has been a direct consequence of City's intentional deceit.  The Defendant's own analysis establishes that it has treated Black employees differently – with no legitimate reason for doing so.

17.     This conduct is particularly egregious because as government employers, CCSF and the Department of Public Health have not just the opportunity, but the obligation to set the standard for compliance with the law on discrimination, harassment, and retaliation.

**B.    BRENDA BARROS**

18.     Brenda Barros was hired in 1979 by Defendant to work in the San Francisco Department of Public Health as a Clerk in the Medical Records Department on the Second Floor at San Francisco General Hospital.

19.     After being hired, Barros returned to school to improve her skills.  As a result of that skills enhancement, she was promoted to a higher level Medical Records Clerk classification in 1982.

20.     From 1985-2018, Barros worked at the San Francisco General Hospital (SFGH) on the first floor as an outpatient unit clerk and then a senior unit clerk in the Richard Fine People's Clinic (formerly known as the General Medicine Clinic).

21.     In 2010, Barros applied for a Chief Clerk position at the Airport.  She took and passed the test.  Even so, she was officially deemed "not qualified."  The position went to a less experienced Caucasian that had fewer qualifications.  Barros complained of this denial of promotion to upper management.

22.     In 2015, Barros learned from the Primary Care Manager that over a period of years she had in fact been performing higher level work than called for in her job classification yet was not getting paid at the higher level (i.e., "working out of class").  Caucasian co-workers were performing the same level of work but were getting paid at the higher level.  Barros complained to management regarding this disparity.

23.     Barros wanted to improve her skills and to advance in the workplace. Barros recognized that she needed training to advance.  She repeatedly and persistently sought eligibility training but was consistently refused.

24.     When Barros worked in the clinic she witnessed how her coworkers treated Black patients.  If a Black patient wanted medicine, the nurses often treated the patient as if he or she were an addict.  The attitude toward other patients, particularly Caucasians, was completely different.  If such patients asked for medication, the nursing staff would try to help them.

25.     Barros was the only Black employee in her particular unit.  Black patients refused care or provided insufficient care often complained to Plaintiff.

Barros would then relay the complaints to Nurse Manager Phillipa Doyle. As far as Barros could observe, Doyle and other managers took no action in response to such complaints.

26.     On September 20, 2018, there was a rally in front of the Department of Public Health at 101 Grove Street, San Francisco, California, protesting racial discrimination in the Department's workplaces.  Barros was present and participated in that rally.

27.     Following the September 2018 rally, Barros and others complained to upper management, including CEO Ehrlich and Grant Colfax, head of the San Francisco Health Department, to discuss the complaints of racially disparate treatment both generally and as to her specific experience.  There were a number of meetings, including a one on one meeting between Barros and Mr. Colfax.

28.     Mayor London Breed created the Racial Equity Task Force.  Barros participated on the Task Force, attending multiple meetings. The purpose of the task force was to address racial discrimination in the work place.  At San Francisco General Hospital the lead participant was Tosan Boyo.  Barros participated in the task force with the purpose of eliminating the racial discrimination she and her colleagues encounter in the DPH work site.

29.     In 2018, Barros applied for training on EPIC, the new DPH patient management and healthcare software system, which she needed to perform her work. The request was refused without explanation.

30.     On June 19, 2019, Barros participated in an even larger rally in front of San Francisco City Hall protesting racial discrimination in the San Francisco City work place.

31.     After more than 30 years in the clinic, DPH management involuntarily transferred Barros into the Eligibility Patient Access Unit.  Barros was not given an

Eligibility classification nor would the unit management allow Barros to get necessary training, or allow her to take the test for such a position with an Eligibility classification. Without being allowed to take the test, Barros was unable to advance, and her career was effectively shut down. In the new unit, Barros was excluded from important meetings. Out of 45 people in the unit, Barros is one of only 3 people in her job classification of PR access 2.

32.    Diana Ramirez, Barros' new supervisor, told another employee that "I don't want those people there." Barros confronted Ms. Ramirez and asked if she said that. Ms. Ramirez admitted she did say it, telling Barros: "That's true … and you don't have the proper training." Of course, Barros had been attempting to get that training for years, but her requests were always denied. Ms. Ramirez told Barros to "just go out and try to learn, you need to go get it somewhere else." So Barros applied for Eligibility training when it became available. Ms. Ramirez, however, refused to approve it. She said "I don't think that training is important."

33.    During the first "1 on 1" meeting between that Barros had with her new supervisor, Ms. Ramirez asked "When do you think you are going to retire?" Barros told Ms. Ramirez she had no such intention.

34.    On two occasions within the past two years, Barros received emails about Eligibility Department Trainings. On each occasion she duly signed up, as she was required to do. At no time before the start of the training was Barros ever told she could not attend. Both times she showed up and was seated in the audience waiting for the presentation to start. On both occasions, Robert Pineda, the presenter, announced that Barros had to leave because her participation had not been approved.

35.    When the COVID-19 pandemic arrived, Ms. Ramirez instructed Barros to work in the lobby to screen patients. Barros was the only employee that Ms. Ramirez required to work in the lobby. Plaintiff told Ms. Ramirez she was vulnerable

both due to her age and comorbidity, as she has COPD pulmonary disease.  That made no difference to Ms. Ramirez, who persisted in her directive that Barros work in the lobby screening patients.

36.     When Barros was working in the lobby, Ms. Ramirez prohibited her from wearing a mask. Dr. Alicia Fernandez saw Barros without a mask and told Plaintiff to wear one.  Barros said that her boss would not allow her to.  In response, Dr. Fernandez got a mask and ordered Barros to wear it, which she did.  Dr. Fernandez was subsequently criticized by management for directing Barros to wear a mask. Barros thereafter was required to work in the lobby screening patients without a mask.

37.     In employee meetings regarding COVID-19, Barros complained about employees not getting tested.  The Eligibility Patient Access Unit serves many mentally ill and homeless patients, as well as many patients who are sick with various conditions, Barros was worried about the employees getting infected from the patients and about employees infecting the patients.  Ms. Ramirez and other patients dismissed Plaintiff's concerns.

38.     Barros was on medical leave from May 11, 2020 until August 12, 2020.

39.     Shortly after coming back from leave, Barros called her direct supervisor, Ms. Ramirez, who told Barros: "I don't like to fire people, but I have done it."  Ms. Ramirez then complained about Plaintiff's "equity work."

40.     Once Barros was back in the workplace, numerous coworkers said to her "I thought you retired."

41.     Since being transferred into Eligibility, Barros has been asked repeatedly, at least 50 times, "When are you going to retire?"

C.       **KIM C. LYNCH**

42.      Kim C. Lynch was born in Oakland and has lived in the Bay Area her entire life.

43.      Lynch is a licensed Registered Addiction Specialist, which qualifies her to work in substance abuse counseling and in case management.  She is licensed by CAPP, which is run by the State of California.

44.      Lynch was hired by Defendant City on September 26, 2006.  She worked in the Health Department under the classification of Health Worker 3 as an Abuse Counselor and Case Manager.  Her official place of employment is at San Francisco General Hospital and she does her work at the Tenderloin Clinic.

45.      Lynch manages the Office Based Opiate Treatment Program, the only program of its kind in the State of California. It consists of integrated services of primary care, mental health, social work and substance abuse.  It is one of the busiest clinics in the entire City of San Francisco, if not the State of California.

46.      Ordinarily, the City has a homeless population that ranges from 13,000 to 15,000 people. With the COVID-19 induced economic crisis that number is now, upon information and belief, even higher.  The clinics serving the needs of San Francisco's homeless population are very few and far between, but gives essential medical care to thousands of homeless people.

47.      Lynch has a case load of 40 patients.   She works from 7:00 a.m. to 4:00 p.m. She must meet with every single patient by the end of each month, which can be difficult as it is challenging to schedule or reschedule such patients.  Lynch makes sure that they are getting all of their housing, methadone, and services every month and, if necessary, she refers the patients to specific health providers and dental care.

48.      Currently and historically there are no Black doctors, no Black nurses – either RN or LVN, no black social workers and no Black psychologists, at the

Tenderloin Clinic. Aside from Plaintiff, there are no Black people for the patients to work with.

49.     As long as Lynch has performed work at the Tenderloin Clinic, every time a Black person gets a job they are discharged during probation. Defendant City hires Black people to make the numbers look good and then the Black person invariably gets fired before the probation period is over.

50.     For many years, Lynch's clientele was predominately Caucasian and she received few, if any, Black patients, because Black patients were not being received through the "Intake Assessment."   In 2017, when Lynch started doing the "Intake Assessment" she started getting more Black patients in her case load.  Today her clientele is more diverse than it was before, however these patients are still not served by Black caregivers for the reasons set forth herein.

51.     Black patients frequently do not want to deal with the non-Black doctors who work at the clinic. Often they feel that the non-Black doctors do not believe them and, upon information and belief, frequently the non-Black doctors do not believe their Black patients.  As a result, those patients do not get their needed medications and their health suffers as a result.

52.     Because Defendant City does not hire more Black people to perform caregiving responsibilities, Lynch has to do more work than would otherwise be the case.  The doctors, nurses and other care givers either lack cultural sensitivity or are prejudiced outright.  As a result Lynch had to work harder to perform tasks that others should have done.

53.     Non-Black doctors, nurses and other caregivers have repeatedly refused to provide services to Black patients and/or ordered them out of the clinic, contributing to the hostile environment that Lynch has experienced.

54.     In 2016, Lynch sat on a hiring panel for two Associate Medical Director openings. The successful candidates were both white women who had each gone to school with the Medical Director, Dr. Pace. There were two Black doctors interviewed for the position. Both of those two should have gotten the job because they were better qualified than the two white women and because they demonstrated commitment to the work of the clinic.  Both of the white women, who were hired, quickly abandoned their positions in favor of more highly paid jobs elsewhere in the City.  The Associate Medical Director positions were not filled after the women abandoned them.

55.     In 2017, Lynch sat in on numerous interview panels for Doctor, Social Worker and Nursing positions.  Management falsely claimed there were no Black candidates to interview.  In fact, the decision-makers, all of whom are non-Black, gave jobs to their friends and family, all of whom were non-Black.  Lynch complained about this repeatedly.

56.     In 2018, Barbara Garcia, then Director of the Department of Public Health, instructed her subordinates Alice Chen and Roland Pickens to meet with caregivers to discuss concerns regarding patient care.  Ms. Chen met with Lynch and other caregivers on August 5, 2018, from 8 to 9 a.m.  Ms. Chen did not give the people present time to go over three pages of incidents that had occurred at the Tenderloin Clinic.  The purpose of the meeting was to highlight the absence of programmatic stewardship, the lack of responsiveness, poor training and orientation of staff, lack of supervision, the absence of programmatic vision, goals and philosophy, and how this has resulted in on-going, alarming substandard patient care to a vulnerable patient population.  Notwithstanding that meeting, neither Ms. Chen, Mr. Pickens, nor Ms. Garcia followed up to investigate in three pages of incidents pertaining to substandard patient care.

57.     In September 2018, Lynch and other Black employees went to a hearing at City hall in the Chambers of the Board of Supervisors.  All the Supervisors were present

and the room was packed (standing room only) with Black people who testified as to racial discrimination in the various City work places.  The complaints made at this meeting included, inter alia:

    a.  Discriminatory hiring practices;

    b.  No Black doctors, no Black social workers:

    c.  Failure to promote qualified Black, while favoring less qualified non-Blacks; and

    d.  Use of racial slurs in various languages.

58.    On June 19, 2019, many Black employees, including Plaintiff Lynch, conducted a rally on the steps of San Francisco City Hall protesting the racially discriminatory employment practices of Defendant City and the failure, specifically, of Human Resources Director Mikki Callahan to address them.

59.    Defendant City has a practice of denying services to Black patients for arbitrary and capricious reasons:

    a.  John Doe 1 - A 63 year old Black male was denied services for a month in 2010 for helping another Black patient when a social worker refused to provide assistance to the other patient;

    b.  John Doe 2 - A 55 year old Black male  was denied services for two months in 2018 because he was "asking too many questions" and was deemed "hostile" by the care provider;

    c.  John Does 3 - A 69 year old Black male was denied services in 2018 after he asked why his prescriptions were not in;

    d.  John Doe 4 - A 63 year old Black male was denied services for a month without good reason in 2018;

    e.  John Doe 5 - A 55 year old Black male was denied services for a month without good reason in 2018;

f. Jane Roe 1 - A 51 year old Black female was denied services for a month without good reason in 2018;

g. John Doe 3 - A 69 year old Black male was denied services for two months without good reason in 2019; and

h. Jane Roe 2 - A 72 year old Black female was denied services for two months without good reason in 2019.

60.    To compound the unfairness, these and other Black patients who were denied service were not advised that they had any rights to appeal the denials.

61.    Plaintiff Lynch witnessed the denial of services to these Black patients and hundreds more in her career.  These and other denial of services were and are usually without justification, either without a stated reason or for a reason which do not result in denial of services when non-Black patients engage in the identical actions.

62.    Plaintiff Lynch vocally and repeatedly opposed these and other denials of service which appeared to be based on race due to their arbitrary and capricious character.

63.    As the only Black care provider in the clinic, the fact that Lynch has witnessed a steady stream of denials of service to Black patients created a racially hostile work environment,

64.    In March 2020, management of Defendant City denied two requests by Plaintiff to work from home during the Shelter in Place ordered pursuant to the COVID-19 pandemic.  She was deemed an "Essential Worker" and required to come into the work site whereas nearly all of the other employees at the jobsite who performed work similar to that of Plaintiff were allowed to work from home. Upon information and belief, it was not Lynch's direct supervisor that ordered the denial but a higher level manager.  Plaintiff anticipates learning the name of the responsible official in the course of discovery.

65.     From the inception of the pandemic up to the present day, Lynch has been required to report for duty in person while the vast majority of her co-workers were allowed to work from home.  A single nurse charged with assisting Lynch officially remained in the job site.  However, management removed the nurse from the job site at least three times for extended periods for purposes of "deployments" to other work sites.  This has happened three times since the start of the COVID-19 pandemic.  The first time was from March to June 2020 and the third time was from September to November.  During the times in which the nurse was deployed to another work site, Lynch's work load increased by 50%.

66.     In July 2020, Dr, Joseph Pace, the Medical Director of the Waddell Clinic interviewed for the position of Chief Medical Officer.  Although he did not perform the best in the interviews, he was still given the promotion notwithstanding the problems of racial discrimination against Black patients, employees and prospective employees in the clinic under his supervision.

### D.     DELLFINIA HARDY

67.     Plaintiff Dellfinia Hardy is a licensed vocational nurse ("LVN") who has worked for City's Department of Public Health since August 27, 2005.

68.     Hardy's classification since the inception of her employment is 2312 "Licensed Vocational Nurse," and she has always worked at the San Francisco County Jail on Seventh Street.  She loves her job.

69.     As an LVN, Hardy is responsible for, inter alia, assisting registered nurses, preparing inmates' medication, distributing their medication, and assisting with emergency incidents such as providing CPR.

70.     On April 24, 2015, Hardy was severely injured in a freak accident when one of the jail's electric doors malfunctioned and closed on her body, crushing her.

Following this incident, Hardy was on disability leave for one month, and she experiences residual injuries and impact to her health.

71.     Christian Kitchin is a registered nurse who became Hardy's supervisor at the end of 2017 when he was promoted to "Nurse Manager."  Prior to that time,  Hardy had worked alongside Mr. Kitchin on a couple of occasions when he agreed to fill LVN shifts.  During those times, Mr. Kitchin was functioning as Ms. Hardy's equal.

72.     Prior to Kitchin's promotion, Hardy experienced demeaning and misogynist behavior from him.

73.     In January 2018, Kitchin began full-time work as Nursing Director over all County Jail health services.

74.     As Nursing Director, Mr. Kitchin demeaned and degraded Hardy in front of her peers, by refusing to communicate with her.

75.     With one exception, Mr. Kitchin has refused to respond to Hardy's communications. He refuses to meet with her in her personal capacity and when she is acting in a capacity on behalf of the workplace union, he even refuses to meet with her then.  He has scheduled and set meetings during times when Hardy cannot participate or attend, because of the shifts which she is working.  Mr. Kitchin, because of his role as Nursing Director, knew full well that Hardy could not attend those meetings.

76.     Mr. Kitchin has deprived and denied Hardy workplace benefits that she is entitled to, such as training, reassignments, promotions, and scheduling adjustments.

77.     On June 9, 2018, Mr. Kitchin asked LVNs for their opinions about particular scheduling and staffing requirements.  Hardy duly contacted the other LVNs and obtained their opinions, and communicated those to Mr. Kitchin.  He never responded.

78.     On or about June 2018, and again in July 2018, Mr. Kitchin invited Hardy to participate on the interview panel for new hires (for LVNs and RNs).   Hardy gladly

assented to the new responsibility, but then Mr. Kitchin refused to seat her on the interview panel despite her multiple requests, and the panels proceeded without her participation.

79.     On July 3, 2018, Hardy was informed by co-worker Johnnie Williams that Mr. Kitchin had told him to "control your girl," referring to Hardy. Plaintiff approached Mr. Kitchin and asked to speak with him privately about the incident, but Mr. Kitchin refused.

80.     On July 17, 2018, Hardy requested a reassignment application so that she could be moved to an area not supervised by Mr. Kitchin.  In response, he refused to provide the application and did not respond to Hardy's request.  Instead, Plaintiff tracked down the application and completed it, requesting reassignment, but Mr. Kitchin refused to process it.

81.      On August 27, 2018, Hardy sent an email to Mr. Kitchin about receiving training for Outlook software on the computers and her smart phone. Mr. Kitchin refused to respond.

82.     In October 2018, Hardy requested to meet with Mr. Kitchin about the fact that team meetings for the LVNs and other staff were not being scheduled during the swing shift, preventing herself and other employees from participating.  Mr. Kitchin refused to meet with Hardy.

83.     On October 9, 2018, Mr. Kitchin assigned a non-Black male LVN to train new LVNs.  Hardy requested to rotate the training assignment among LVNs so that she (and others who wanted the opportunity) could participate.  Mr. Kitchin not only did not grant the request, he refused to meet with Plaintiff.

84.     In November 2018, Hardy spoke with Rhonda Simmons, Director of City's Workforce Development Department, and advised her she was going  to send her an email detailing the problems she was having with Mr. Kitchin.  When Hardy sent the

email it was also sent to John Jefferies, a Human Resources analyst.  No one ever responded.

85.     In December 2018, a grievance was filed pertaining to the cessation of the practice of rotating assignments for the LVNs.  Hardy had her own personal concerns regarding the cessation of this practice and she tried to bring those to the attention of Mr. Kitchin, but he refused to talk to her.

86.     Mr. Kitchin's ostracism of Hardy continued throughout 2019, with numerous other examples.  Accordingly, throughout 2018 and 2019, though Mr. Kitchin refused to meet with Ms. Hardy to discuss her personal work situation, despite her numerous requests.

87.     Throughout 2018 and 2019, Mr. Kitchin denied Hardy, various promotional opportunities. For example, at the end of 2018, Mr. Kitchin was authorized by DPH to create a "Lead LVN", but he refused to permit Hardy to apply for the position even when she requested to do so.

88.      On or about the late summer and fall of 2019, DPH conducted what can only be called a bogus, harassing investigation of Hardy based on the following allegations: "(1) rude and offensive emails; (2) rude and disrespectful language with the scheduler; (3) claims of bullying; (4) undermining management's direction to staff; and (5) falsely reported workplace violence."  An investigator released a report in November 2019.  Despite literally incredible witness statements, including numerous conflicting statements from witnesses, all allegations except No. 4 were substantiated against Ms. Hardy. The investigation stereotyped Hardy as being an "angry Black woman," a trope commonly used to describe Black females.   Notwithstanding the investigator's determination, the allegations against Hardy were false.

89.     The first issue that the report focused was on a number of emails Hardy had sent in her union capacity and not in her capacity as an employee.  Hardy was also

accused of using curse language in her workplace emails.  Though the investigative report found that the emails did not contain foul language and "did not demonstrate the specific disrespectful or offensive language the witnesses quoted.  The emails reviewed do not contain foul language or direct insults," (in other words, the witnesses were not credible), somehow the investigator still found that "there is a tone to some of Ms. Hardy's messages that can be interpreted to be rude, offensive, and disrespectful" and thus substantiated the allegation of "rude and offensive emails."

90.     The second allegation of using rude language towards the scheduler (employee Modesto Alfonso) was also substantiated despite conflicting witness testimony and a concededly "volatile" meeting about scheduling in which all present were screaming and using foul language.  This meeting did not take place during work hours.  No other employees were ever disciplined or investigated as a result of this meeting.  Hardy was singled out for criticism.

91.     The third allegation, bullying in the workplace, was likewise substantiated by the investigator, even though Hardy's own direct supervisor, Nicole Joe, said she has never received any reports of employees being bullied and that "it's all hearsay."  The investigator accepted the "hearsay," (some of which was even double and triple hearsay, without any witnesses to recount them), and accepted the allegation.

92.     The fifth allegation was that Hardy had "falsely reported" an assault committed against her by a colleague, Ms. Eloisa Ascue. However, that allegation was refuted by correspondence from the City's HR Director, Micki Callahan, to Hardy in April 2019, which acknowledged that a videotape showed that Ascue did make physical contact with Plaintiff.

93.     On December 2, 2019, Hardy was shocked and devastated to receive a Notice of Intent to Suspend for Five Days, based on the allegation that she was guilty of "Bullying in the Workplace."  The Notice was addressed to Hardy personally, but was

**COMPLAINT**

Page 20

sent to the receptionist of Hardy's workplace.  The receptionist opened and read the letter before delivering it to Hardy, subjecting her to further humiliation and embarrassment. Hardy later attended a conference to discuss the charges, but DPH refused to exonerate her of the charges and she continues in limbo as the notice remains pending.

### E.      RACHELL EVANS

94.      Rachell Evans was first hired in 1988 by Defendant to work in the San Francisco Department of Public Health at Laguna Honda Hospital as a "Nursing Assistant."   In that capacity her performance was always satisfactory and usually excellent.

95.      Evans voluntarily left employment with Defendant in 1995 to raise her children.

96.      Defendant City rehired Evans in 2005 as a "Health Worker I."   She worked in the DPH's "Systems of Care" (now called "Legacy.")

97.      Evans' clients included at-risk youth, incarcerated juveniles, and their parents.  She helped parents navigate the juvenile justice system, helped get their children evaluated for services, as well as helping parents regain custody of their children, and learn parenting skills.

98.      In 2012 Program Director Bonnie Friedman told Plaintiff she would be promoted to the Family Involvement Coordinator position. Evans had taken and passed the Health Worker IV examination.  The promotion did not occur.

99.      Bonnie Friedman subjected Black employees, including Evans to closer scrutiny than other employees.  Ms. Friedman assigned other employees to closely monitor her Black subordinates.

100.   From 2005 to 2013, Evans' direct supervisor was Riva Enteen, Family Involvement Coordinator.  Evans' performance was always satisfactory and usually excellent.

101.   After Ms. Enteen departed, Evans acted as the supervisor of the department.  In addition to handling a caseload of around 30 clients, she performed intake interviews for new clients, and assigned those clients to other health workers.

102.   In 2012 or 2013 Evans filed an internal complaint against coworker Wesley Wong, who exercised in his office on a treadmill he kept there.  Wong  dressed in speedos or tight-fitting shorts and other tight-fitting clothes and was frequently barefoot in the work place.  Mr. Wong washed his exercise clothing in the restroom sink, sometimes leaving them there.  The smell from Mr. Wong's office was terrible. Once, it was so bad that Evans got sick and vomited.  As a result of Evans' complaint, Mr. Wong had to remove his treadmill from his office.  After Mr. Wong became aware that Evans filed a complaint against him, he retaliated against her by ostracizing Evans. Although Mr. Wong was not Plaintiff's supervisor, he instructed interns not to talk with her and he instructed the supervisor at the Food Bank not to allow Evans to pick up food, even though she was authorized to do so. Evans had to make another complaint to management to be able to pick up at the food bank. Mr. Wong has a history of problematic relations with his female coworkers.

103.   Shortly after Evans complained about Mr. Wong, Program Director Friedman prevented Evans from applying for the Family Involvement Coordinator position by changing the job criteria in such a manner as to disqualify Evans.  Plaintiff Evans objected to this but Ms. Friedman did not respond.

104.   Ms. Friedman then filled out another job requisition for Family Involvement Coordinator.  This time, the position was posted as a "Health Worker 3" position.  Ms. Friedman tried to keep Plaintiff from applying by posting it as a re-

assignment.  Nevertheless, Evans persisted in trying to get the job.  Evans interviewed for the position, but Ms. Friedman awarded the job to a lesser qualified individual.

105.    Upon information and belief, the successful candidate did not pass the probationary period.  That vacancy was subsequently filled but the position again became vacant. The most recent vacancy was filled pursuant to a job re-assignment notice posted on January 24, 2020, bearing specific language that prevented Evans from reapplying.

106.    In late 2015, Evans applied for a Health Worker 3 position at a Single Room Occupancy Hotel ("SRO"), known as the Windsor Hotel.  Evans was awarded the job.  That job required her to work on site in the Tenderloin neighborhood of San Francisco with a difficult client population.

107.    Evans' job performance at the Windsor Hotel was always satisfactory and was usually excellent.

108.    In 2017, Evans' position was assigned to the newly created Department of Homelessness and Supportive Housing, a division of the DPH. Evans continued to work out of the Windsor SRO.

109.    At the end of 2018, Laura Rodriguez, Evans' immediate supervisor, in performing Evans' annual performance review rated Evans' performance as a "3," the highest possible rating.  Elyse Miller, the supervisor of Ms. Rodriguez, overruled that rating and assigned Evans a lower rating, of "2."   The lower rating stood, notwithstanding the objections of Evans.

110.    By contrast, Miller directed Ms. Rodriguez to give Kelly Hanson, a Caucasian employee, a rating of "3," notwithstanding demonstrated performance problems on the part of Ms. Hanson, including her interactions with other employees and clients served by the Department, which, upon information and belief, led to discipline against Ms. Hanson.  Notwithstanding this track record, Ms. Miller gave

Ms. Hanson a better rating than Evans, who had none of Ms. Hanson's performance issues and, instead, excelled at her work.

111.    Evans complained through various avenues, including to Defendant's Human Resources Director Micki Callahan, who ignored the complaint, Evans eventually obtained a reversal of the performance rating, which was changed to a "3." Only after the fact, did Ms. Callahan deign to respond, and then simply observing the matter was resolved.  Ms. Miller and other managers did not forget Evans' complaint.

112.    In 2019, Evans was denied a performance review.

113.    On March 2, 2020 "R", a former SRO tenant, stopped by to give Evans information about his Social Security application. "R" was denied entrance to the building because he had been kicked out several months prior for breaking the SRO house rules.   Evans met with R outside of the building.

114.    On March 3, 2020 at the end of the day, "P" an SRO resident, took his mattress outside and gave it to his girlfriend.  The front desk attendant called Evans to ask her to bring the client back because he took his mattress outside.  In response Evans reported the matter to her supervisor, Wojciech Kawalek, who said he would address it. The next day, the client was still without a mattress, and Evans called Adult Protective Services to report that "P" had self-neglected by removing the mattress from his room.  Adult Protective Services apparently telephoned DISH, the private company that owns the SRO, regarding the mattress, and DISH phoned Mr. Kawalek.

115.    On March 16, 2020,  Mr. Kawalek issued Evans discipline.  Mr. Kawalek falsely claimed Plaintiff took R into the SRO to meet with him, even though he had previously been kicked out, and that she also "advocated for return of a soiled mattress."  Both of those claims were false.  Evans met with R outside, and she did not advocate for the mattress being returned.  Mr. Kawalek also reprimanded Evans for

calling APS regarding P's self-neglect because, according to Mr. Kawalek the call to APS violated the "sister partner" relationship with the SRO's private owner.

116.   This discipline was, upon information and belief, issued upon the direction of Elyse Miller.  Evans objected to the discipline and explained to Ms. Miller the falsity of the factual predicates upon which they were based.  Notwithstanding the blatant falsity, Ms. Miller ordered that record of the discipline remain in Evans' file.

117.   From March 15, to April 1, 2020, Evans worked from home pursuant to the COVID Shelter in Place order.

118.   Upon completion of the Shelter in Place, Evans was ordered to return to the Windsor Hotel.  She objected to returning in view of the unsafe patient care she had witnessed.  Accordingly, she was ordered deployed to the Bayview Homeless Trailers on April 12, 2020.  Almost all of the people deployed to Bayview are Black or other People of Color.  The clientele of the Bayview trailers is 95% Black.

119.   Evans was next deployed to work at the Moscone Center.  However managers at the Windsor Hotel complained that Evans had not returned.  Evans was ordered to return to work at the Windsor Hotel and to continue working at the Moscone Center.  Evans responded that her hours were 3pm to 11pm and that doing another job was impossible. Following complaints by Evans, she was no longer required to perform both jobs.

F.   **DARLENE DAEVU**

120.   Darlene Daevu was born and raised in San Francisco.

121.   Daevu has an MBA and a project management certificate.

122.   Plaintiff has worked for Defendant City and another public entity for over twenty years.  She had earlier periods of employment with Defendant City but has been employed with the City continuously for purposes of this lawsuit since 2008.

123.    During her employment with the City, Daevu has enrolled in outside course work and trainings, and repeatedly sought avenues to advance her career.  She has applied for over 200 positions with the City; and at one point was on seven different eligibility lists.  She has repeatedly been frustrated by the process, and has been unable to understand testing scores, promotions of others over her, and failures by Defendant City to adhere to the promotion rules.

124.    In 2016 Daevu was promoted to the position of Health Program Coordinator III, in the Department of Public Health, Population Health Division, Office of Operations, Finance and Performance Management. She is a project manager who has overseen projects and programs, including launch of electronic payroll, launching, monitoring and controlling, Linguistic Services, launch of DocuSign, and maintaining a cultural competency database.

125.    In September 2018, Daevu applied for the position of Director of Equity, Social Justice and Multicultural Education. She ranked #1 on the examination, while the person who ranked number 6, was hired. The individual who was hired has a different national origin and ethnicity than Daevu but he does have the same national origin and ethnicity as the Deputy Director of the Department of Public Health. Another Black employee applied for the same position and she finished third on the examination, but she did not get interviewed. At least Daevu got an interview.  Like Daevu, this candidate is Black but of a different national origin and ethnicity than the successful candidate.

126.    Daevu objected to being denied the position of Director of Equity, Social Justice and Multicultural Education. Alleging unlawful employment discrimination, Daevu made a complaint via the Civil Service Commission.

127.    The individual who obtained the position of Director of Equity, Social Justice and Multicultural Education left the position in December 2019. When Daevu

found out he was leaving she emailed the Department Head and said she would like to work in the position, as Acting Director.  Daevu was told that someone else had already been hired into the acting position, a female who, upon information and belief, is of the same ethnicity as the Deputy Director of the Department of Public Health and the prior successful candidate. The individual placed in the acting director position was not on the eligibility list, did not take the exam, did not interview, and did not work in the department as long as Daevu has.

128.    Between 2017-2019, Daevu assisted Manager David Rizzolo, with his duties as Fleet Manager.  In September 2019, David Rizzolo retired from his position (Fleet Manager 1 – 0922).  Marise Rodriguez, a non-Black employee, was placed in the acting position.  After Daevu asked to be considered for the position, the position ("acting fleet manager") was split between her and another employee, Marise Rodriguez.  These duties were in addition to other job duties. Daevu's pay was not increased. She assumed these additional duties from September 2019 to March, 2020.

129.    In March 2020, during deployment during the COVID crisis,  Daevu was deployed to work as a receptionist at the Moscone Center and she was also required to perform filing duties.

130.    After Daevu's COVID-19 re-assignment, the acting fleet manager job was given to two male employees, who are not part of the protected class.

**G.    JO-THERESA ELIAS-JACKSON**

131.    Plaintiff Jo-Theresa Elias-Jackson was hired in 1994 as a Systems Analyst on a temporary basis for the Public Health Department. The job site was at San Francisco General Hospital.

132.    Elias-Jackson worked in Personal Computer Application support.  She used Microsoft Access as a tool to create database applications for the Public Health Department.

133.    The position of Elias-Jackson became permanent in 1995 as a Systems Analyst. This was the same job that she had previously held but  with additional responsibilities.

134.    Elias-Jackson was promoted to the position of Senior Business Analyst in 1997.

135.    In or about 2003 Elias-Jackson was promoted to Business Analyst Principal position.  The position had more implementation responsibilities and a bigger managerial role.

136.    In 2014, a reorganization occurred and a lead position was created.  A less qualified Caucasian male was appointed to the lead position.  Had Elias-Jackson received the job, she would have received a 5% raise.

137.    In 2015, Plaintiff filed an Administrative Complaint with the Department of Fair Employment and Housing alleging discrimination in the hiring of 1070 Tech positions.

138.    Hal Kress had the lead position, which gave him supervisorial responsibilities over Elias-Jackson.  Once, the entire work group, consisting of 5 or 6 people, went to a restaurant. While they were there, Mr. Kress accused Elias-Jackson of fraudulently using a handicapped placard in front of her co-workers, saying, "You shouldn't be using your Dad's placard." Elias-Jackson said "This isn't my Dad's placard, it's my own."  Mr. Kress knew that Elias-Jackson's father had previously suffered a stroke.

139.    Mr. Kress demanded to be present whenever Plaintiff trained colleagues.

140.    On December 4, 2015, Lead Mr. Kress and Director Winona cornered Plaintiff in her basement office.  During that confrontation they interrogated her on the work she was performing, demanding to know exactly what tasks she was performing, even they knew perfectly well what she was doing.  In the course of that

confrontation, they also threatened to cut or stop her pay.  The manner in which two leadership staff confronted Elias-Jackson was highly irregular from established work place practice, and Elias-Jackson became very frightened.  Thereafter Elias-Jackson went on disability leave due to stress.

141.    Upon Elias-Jackson's return from disability leave, Mr. Kress accused her of being "Absent Without Leave."

142.    Under the supervision of Elias-Jackson by Mr. Kress, she was subjected to a formal investigation based upon a fraudulent pretext, and interrogated by Human Resources.   After a substantial amount of time, Elias-Jackson asked about the status of the investigation.   Only then was she told it had concluded "with no findings."

143.    Elias-Jackson was also accused, wrongfully, of submitting fraudulent time sheet hours. She unsuccessfully attempted to get relocated to another IT Department but was compelled to move to the basement again under the same supervision.

144.    In or about  2016, Elias-Jackson met with Chief Information Officer Bill Kim and asked to be reassigned to the Project Management Office (PMO).  He asked if she had her PMP ("Project Management Professional") Certification and when she replied no, Mr. Kim refused her request on the ground she did not have her PMP.  Mr. Kim advised her that he would keep her in mind when classes occurred.  However, Elias-Jackson was never allowed to take such classes.  Moreover, some of those assigned to work at the PMO did not have PMPs or even get PMP training, but either were promoted or got assigned to extended ranges which pay more money.  Those assigned to work at the PMO without PMP or PMP training were substantially younger than Plaintiff.  Mr. Kim's denial of this training and assignment to the PMO

impacted her by blocking her career path and denying her pay increases which come with promotion.

145.    Elias-Jackson worked in the basement until 2016, when she was moved to the Fourth Floor and a new supervisor, Rosana Leon.

146.    Ms. Leon's nickname for Elias-Jackson was "Ms. Nasty." Ms. Leon yelled at Plaintiff, raising her voice frequently.

147.    Elias-Jackson transferred to the San Francisco Police Department from April to October 2017.

148.    In or about November 2017, Plaintiff returned to the Department of Public Health where she was assigned to Emergency Medical Support at 101 New Montgomery Street, San Francisco, California.  Subsequently she transferred to San Francisco General to get training for her EPIC certification.

149.    In 2017, Patrick Johnson, a Caucasian, was hired for a Business Analyst Principal position, the same position as Elias-Jackson had held for over fourteen years. Mr. Johnson had previously worked as a contractor on the Rebuild Project.  Elias-Jackson had trained Mr. Johnson and provided him instruction prior to him being hired for the Business Analyst Principal position.

150.    In 2018, while Elias-Jackson was on disability leave due to a fractured foot, she applied for a director position for which she qualified. There were three openings for the same position. Elias-Jackson was offered an interview.  However, she was unable to be physically present due to the foot fracture.  She requested that she be allowed to participate in a remote interview.  Initially the request was granted by the hiring manager but before it occurred, the offer was revoked.  Upon information and belief, the decision to deny the request was made by Human Resources.

151.    Trying to find a way to advance, from October 2019 through December 2019, Elias-Jackson had asked the Associate CIO Mindolovich and Manager Genevro

for a meeting to discuss guidance/mentorship.  Ms. Mindolovich advised Elias-Jackson she should reach out to two PMO managers.  When she did, one advised her the IT Director job (the same position for which she was denied a remote interview) had been vacated about October or November 2019) and was told this position was "Temporary Exempt"  and it might be gone with staff's retirement and "would find out more in the next few weeks" but Elias-Jackson heard nothing more to date.  A Meeting was scheduled with another Director of PMO, Vici Pars, but after being rescheduled several times, it never occurred.  A meeting with EPIC Director Jeff Scarafia took place on November 21, 2019, but despite generalities no promotional or training opportunities resulted.

152.	In May 2019, a Project Director position was created for Patrick Johnson, notwithstanding management's representation that a promotion could only be attained through attrition. Mr. Johnson had substantially less experience than Plaintiff. In  November 2019, Mr. Johnson left the DPH to go to Ohio.

153.	Elias-Jackson immediately emailed management seeking to apply for the newly vacant Project Director position. She was told that the position would not be filled, because purportedly "it wasn't needed any more."

154.	Upon completion of a successful implementation of EPIC in August 2019, Elias-Jackson asked to be assigned Extended Range, in which her salary would be increased consistent with other staff that had EPIC experience. Manager Scarafia refused,  telling Plaintiff that the only way she could get promoted was through attrition (i.e., the creation of a vacancy through the departure, promotion or discharge of an employee from an existing position).

155.	In July 2020, Elias-Jackson requested training on EPIC.  This training was necessary for her to do her job and to advance.  The requests were denied in September 2020.

156.    Elias-Jackson learned on September 22, 2020, that a non-Black co-worker, with lesser or equal qualifications to her, had obtained EPIC training she had previously sought and been denied.  Had she been provided the same training she would have qualified for promotion to a Tech lead position, which had been vacated in July 2020.

157.    In July 2020, Elias-Jackson complained that she was not receiving sufficient "Stand By Time."  Stand By Time are periods of time in which members of the Department of Public Health IT staff are available via telephone during non duty hours to respond to questions from DPH staff when the IT Department is closed. IT staff are paid for time spent responding to inquiries when they are on "Stand By." Plaintiff was denied on grounds that the cut-off date had passed, a claim that was patently false.  Elias-Jackson does get Stand By Time but usually in lower amounts than her non-Black co-workers.  If she received Stand-By time commensurate with her coworkers, she would receive more compensation.  This is notwithstanding the fact that she has the highest seniority and would, but for her race and age, ordinarily receive more stand by time than less senior employees.

158.    As of September 30, 2020, within the past year Elias-Jackson has submitted five applications for promotional opportunities within Defendant City. She was well qualified for each position but each application was refused, without even an interview.

**H.    DONNA JAMES**

159.    Plaintiff Donna James earned a Bachelor of Science degree from California State University, San Jose in 1984.

160.    James obtained a Medical Assistant Certificate while she was employed at Planned Parenthood in the 1990s.

161.    James earned a Master of Social Work in 2007 from California State

University, San Francisco.

162.    James was hired by Defendant City in 2003.  Her first position was as Medical Assistant at the Southeast Health Center,

163.    From 2009 to the present, James has worked as a Medical Assistant at the Tom Waddell Urban Health Center.

164.    Since starting to work at Waddell, James has repeatedly sought promotion to a Social Worker position.

165.    Because James' job title is "Medical Assistant," her boss Rebecca Silverman told her that she could not be trained as a social worker even though she has a Master's Degree in Social Work.

166.    James repeatedly requested training as a social worker, which just as repeatedly was denied her.

167.    Pam Swealdow, the Social Worker Manager at Tom Waddell told James that she needed two years' experience as a social worker.  However, Caucasians were hired that lacked the two years' experience.  At the Tom Waddell Urban Health Center, there are five social worker positions, all of which are held by Caucasians.

168.    James has applied for at least 20 social worker positions, the latest being in February 2020.  The most recent application was denied in favor of a less qualified non-Black.

169.    On or about July 2018, James spoke with Beata Chapman and Betsy Grand, both staff at the Human Resources Commission of Defendant City regarding the fact that she could not get promoted to the social worker position.  In response, Ms. Chapman said "Maybe you didn't get the job because you are a little too dark and fat."

170.    James complained about Ms. Chapman's statement, as did Betsy Grand. However, the Department of Human Resources in its investigation represented that Ms. Chapman made a comment regarding James' weight while suppressing the remark Ms.

Chapman made about James' color/race.

I.   **CHERYL THORNTON**

171.   Cheryl Thornton is a Black female over the age of 39.  She has a Bachelor of Science degree from San Francisco State University in industrial psychology.

172.   Thornton started working for Defendant City in December 1991, when she was hired by DPH as a temporary unit clerk.  From 1994 to 2018, she worked as a Principal Clerk.  She remains employed at DPH.

173.   In December 2018, Thornton was appointed to the Mayor's Task Force on Racial Inequity.  The purpose of the Task Force was to evaluate workforce data from the Department of Human Resources and make specific requests and recommendations that would improve the hiring, employment, and promotion of people of color within the City's workforce.  Thornton served on this Task Force until May 2020, as the Task Force is not currently meeting.

174.   In February 2019, Thornton interviewed for a promotional opportunity as a Practicing Manager at the Potrero Hill Health Center, which would have entitled her to higher pay, additional training, the opportunity to manage and lead other employees, and the opportunity to conduct more work from home, reducing her risk of COVID-19 transmission to herself and her family.

175.   In March 2019, Thornton's position was reclassified to make her an "Eligibility Supervisor."

176.   In June 2019, a rally was held to protest the inequitable treatment of Black employees of the City. Thornton, along with Plaintiffs Barros and other City employees, spoke at the rally.  At the rally, several individuals called for the resignation of DHR Director Micki Callahan.

177.   In August 2019, Thornton was informed by Linda Simon, the Equal Employment Opportunity and Leaves Program Director at the DHR, that she did not

receive the promotion.  When Thornton asked why, given her extensive qualifications and service to CCSF,  Ms. Simon informed Thornton that while she had done "very well" in the interview, and was very well-qualified for the position, the City was denying her the position based on an alleged answer to a single oral question at the interview.  The question was what Thornton would do if a patient was "escalating," *i.e.*, becoming violent with staff.  Ms. Simon said that DPH was concerned over Thornton's response to "call the Sheriff's office."  Thornton vehemently denied saying that, and repeated her actual response, which was to try to figure out the patient's concerns, and if that did not work, to call a manager.   Thornton told Ms. Simon that in her nearly thirty years at DPH, she had only called the police on a patient one time, when the patient had a gun.  Ms. Thornton is highly sensitive to the fact that calling law enforcement is the least attractive option in most cases.  Thornton asked that she be re-interviewed, but Ms. Simon refused.

178.    Instead, the promotion was awarded to a 30-year-old male with no experience working for City, rather than Thornton.

179.    Thornton complained regarding the denial of the promotion.  She has subsequently received further communications indicating that CCSF is still recruiting for the position, but each time she considers applying, she receives a letter from City informing her the position has been filled.

180.    In September 2019, a longstanding DPH employee, Roxanna Castellon, who worked as an Eligibility Supervisor, left the department.  Thornton, the most senior member of the department, was once again passed over for a promotion in favor of a younger male, Robert Pineda, who is also not Black.  Mr. Pineda now supervises Thornton.  When Thornton complained that she had more experience than Pineda with eligibility and with supervising other employees, and asked to be awarded the position, DPH instead awarded Thornton a position as "Equity Champion." However, this is not

a paid position, and not a promotion, but instead, is a voluntary position with a one-year term, which Thornton agreed to perform in addition to her full-time work, in the hopes it would showcase her commitment to her work.

181.     During the fall of 2019, Thornton heard about an opportunity to receive additional leadership training.  She had a meeting with Pineda, her supervisor, and asked to participate in this training, but was denied, even though others with considerably less experience did receive the training.

182.     In October 2019, Thornton was denied a separate promotional opportunity (as Manager I).

183.     Throughout 2019, Thornton was assigned to work at various DPH clinics as a "floater": first, at 30 Van Ness Admin, then at the Southeast Health Center, serving the Bayview neighborhood.  By assigning Thornton to serve as a "floater," City denied Thornton stability in her work, the opportunity for training, and the opportunity to manage and supervise employees at a single clinic. In particular, while working at the 30 Van Ness Admin role, Thornton was often not even assigned any duties at all, which caused her extreme embarrassment, humiliation, and distress.  For example, on August 1, 2019, DPH released its new software program EPIC.  The release of the new system had been three years in the works and was eagerly awaited by DPH employees.  Rather than receiving a work station and the responsibility to review the new operations and the release of the system, as her colleagues did, Thornton was assigned other, unrelated duties.

184.     In February 2020, City released the 2020 Workforce Report, described herein in detail.  Thornton was extremely distressed and horrified to see that after all of the meetings, the work that she and many others performed on behalf of Black CCSF employees, the Task Force, and her work as an "Equity Champion," the data still demonstrated that City was egregiously discriminating against Black employees.

185.     Also in February 2020, as news of the pandemic was becoming widespread, Thornton purchased an isolation mask and wore it to work.  She was reprimanded for wearing the mask.

186.     In March 2020, Thornton and other Black employees were scheduled to meet with Micki Callahan, Linda Simon, and Sheryl Davis, Director the City Human Rights Commission.  The meeting was cancelled due to the COVID-19 pandemic, and has not been reset.

187.     On March 19, 2020, the first day Southeast Health Center employees returned to work following the initial shutdown, it was clear that DPH did not have sufficient personal protection equipment ("PPE") for its employees. Thornton and other Southeast Health Center employees were thus asked to screen patients from the lobby while the patients remained outside.  The employees complained that they would be safer behind their glass work station with the patients coming in one at a time, but DPH refused.

188.     On March 30, 2020, Thornton and certain other employees were told that they should screen patients outside the clinic, *i.e.*, on the sidewalk.  Only Black employees were ordered to work outside.  Thornton was provided with five masks to hand out to patients, which left Thornton and all other employees screening the patients without masks.   Thornton complained to her supervisor that only Black employees were being asked to screen potential COVID-19 carriers outside without sufficient PPE. After a patient sneezed on her, Thornton decided she had no other option but to leave for the day.

189.     Thornton returned to work on April 3, 2020, but the unhealthful conditions were not remedied.

190.     On April 3, 2020, Thornton filed a complaint with CAL-OSHA, and that agency sent the City a cease and desist letter to remedy the unsafe conditions.

191.    On April 5, 2020, Thornton also complained to City HR Director Micki Callahan.

192.    On April 7, 2020, the day that City received the CAL-OSHA response to Thornton's complaint, Mr. Pineda informed Thornton that she should go home and self-quarantine for 14 days.  Though other employees were present during the incident and also exposed, none of them were ordered to self-quarantine or removed from their duties.

193.    Thornton obtained a COVID-19 test, which showed she was negative. With the negative result, the City permitted Thornton to return to work after five days of quarantine.

194.    Also on April 7, 2020, Thornton filed a follow-up complaint with CAL-OSHA.

195.    On April 12, 2020, Mr. Pineda told Thornton that she was relieved of her duties at the Southeast Health Center as a result of her CAL-OSHA complaint.

196.    As a result of being banned from Southeast Health Center, Thornton is no longer able to work at that clinic to earn overtime since the other clinics are not open on weekends, even as other employees are still able to earn overtime pay.  She also lost the opportunity to supervise employees at the Southeast Health Center and experienced the humiliation of being transferred against her will.

197.    On April 14, 2020, Thornton received a reprimand from her supervisor (Pineda) for failing to respond to an email, even though a response had not been requested by a specific time.

198.    On April 17, 2020, Thornton filed a complaint of discrimination and retaliation complaint with the City's EEO Office.

199.    On April 13, 2020, Thornton started at the Tom Waddell Clinic.  The Tom Waddell Clinic services the Tenderloin and it is widely regarded as one of the most

difficult clinics to work in.  In addition, the building in which the clinic is housed experiences frequent plumbing problems, including a recent incident on September 9, 2020, in which raw sewage streamed through the clinic's offices and lobby.

200.    On April 30, 2020, Thornton received a reprimand from Pineda for failing in her turn in her time sheets, which she had not received due to the move in work locations.  In addition, Thornton was told by the payroll clerk that Pineda had specifically instructed that the time sheets be withheld from Thornton.

201.    On May 19, 2020, Thornton requested permission to telecommute given that she has an underlying medical condition and a resident family member with an underlying medical condition.  Instead of receiving telecommuting privileges, she was given space to work at Laguna Honda Hospital, which was experiencing an active COVID-19 outbreak at the time.

202.    On June 10, 2020, Thornton complained to the DPH Director, Dr. Colfax, that there was no way she could obtain a fair performance appraisal for this year because her supervisor had not met with her a single time in the Performance Appraisal cycle.

203.    On September 9, 2020, certain probationary forms were sent out to all of the employees in Thornton's class.   Thornton was asked to "pre-sign" the form, i.e., to relinquish her rights to review any comments management would provide about her on the form.  When Thornton refused, she was issued a counseling (written discipline).  No other employees were asked to pre-sign and turn in the form, and no other employees did so.

204.    On September 9, 2020, the Tom Waddell Clinic was flooded with raw sewage.

205.    On September 11, 2020, a management call was held between Mr. Pineda and all other 2909-class employees.  Mr. Pineda stated that the unit would have

received a score of 100% for completing tasks "if it had not been for Cheryl, because Tom Waddell flooded."  Thornton was in no way responsible for the flood, which was undeniably due to failure in management of the clinic's building plumbing.  Indeed, the plumbing has failed on numerous other occasions, creating unsafe conditions for employees and patients alike.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Racial Discrimination - Disparate Treatment in Violation of 42 U.S.C. § 1983**

**[As to all Plaintiffs]**

206.   Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 8 and 10 through 205 with the same force and effect as if fully pleaded at length herein.

207.   At all times herein relevant, Plaintiffs' job performance was always satisfactory and was usually excellent.

208.   This is a claim to remedy egregious discrimination in violation of the Fourteenth Amendment to the United States Constitution.

209.   At all times herein relevant, Defendant City had and has a long-standing, deep-rooted policy and practice of discrimination against its Black employees in the Department of Public Health Department, aided  and abetted by personnel within the Department of Human Resources, including but not limited to Micki Callahan. The purpose and effect of such policy is to limit the hiring and advancement of Black employees.

210.   Said policies have resulted in a series of adverse employment actions against these Plaintiffs which include, but are not limited to:

    a.   Denial of necessary training;

    b.   Denial of training opportunities;

c.    Denial of promotions;

d.    Substandard performance reviews;

e.    Denial permission to work from home;

f.    Increased work load than non-Blacks;

g.    Being required to "work out of class," (i.e., perform higher level work than called for in the official job description but not receiving the pay at a level commensurate with the level of work performed;

h.    Denied opportunities to earn "stand by" pay accorded to co-workers;

i.    Unjustified discipline; and

j.    Being required to assigned more hazardous work than those not in their protected class.

211.    The adverse employment actions alleged in paragraph 210 herein were and are continuing in character.

212.    As a result of the aforesaid acts of discrimination, Plaintiffs have suffered and are continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently un-ascertained.  Plaintiffs face substantial diminution of their future earning capacities in an amount which is currently unascertained.  Plaintiffs will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

213.    As a result of the aforesaid racially disparate treatment, Plaintiffs have been held up to great derision and embarrassment with fellow workers, friends, members of the community and families, and continue to suffer emotional distress because the Defendant demonstrated to the Plaintiffs  that it would not recognize nor accept them as employees solely because of their race.   Defendant City acted

unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proven at time of trial.

214.    In bringing this action, Plaintiffs have been required to retain the services of counsel and they are, therefore, entitled to an award of attorney fees.

<u>SECOND CLAIM FOR RELIEF</u>

**Racial Discrimination – Hostile Work Environment in Violation of 42 U.S.C. § 1983**

**[As Plaintiffs Barros, Lynch, Hardy, Evans,**

**Daevu, Thornton & James only]**

215.    Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 8, 10 through 130 and 159 through 205 with the same force and effect as if fully pleaded at length herein.

216.    This is a claim to remedy egregious discrimination in violation of the Fourteenth Amendment to the United States Constitution.

217.    Defendant City had and has a long-standing, deep-rooted policy and practice of discrimination against its Black employees in the Department of Public Health Department, aided and abetted by personnel within the Department of Human Resources, including but not limited to Micki Callahan. This includes, but is not limited to, the toleration, if not encouragement, of managerial staffs who engage in acts of harassment against their Black subordinates.

218.    The Plaintiffs herein have been harassed by the managerial employees of Defendant City in the following ways:

    a.    Ostracism of Black employees by their managers;

    b.    Public humiliation of Black employees;

    c.    Requiring Black employees to perform menial work below their job classifications;

d.    During the time of the COVID-19 Pandemic, requiring Black employees
to perform duties that management knew exposed them to infection; and

e.    Disrespecting and refusing to serve Black patients and clientele.

219.    Staff of Defendant City's Department of Human Resources also engaged
in activity that had the purpose and effect of creating a racially hostile work
environment through the use of racial slurs. Then, staff and management of Defendant
City's Human Resources Department purported to investigate such incidents while
suppressing the evidence of  racial animus. Said suppression was known to responsible
Human Resources Executive staff.

220.    Defendant City, as alleged herein, knowingly created and/or maintained
a hostile work environment on the basis of race. Defendant, by and through its
executives and managers, either knew about the hostile work environment and failed to
take remedial action, or themselves created a hostile work environment based on race.

221.    As a result of the hostile work environment as described herein,
Plaintiffs have been held up to great derision and embarrassment by their fellow
coworkers, friends, and members of the community. Plaintiffs have suffered emotional
distress because Defendant City has subjected them to a racially hostile work
environment.  Plaintiffs are informed and believe that Defendant City maintained such
a racially hostile work environment, knowing that it would cause severe emotional
distress. Plaintiffs therefore seek damages for such emotional distress in an amount to
be proved at the time of trial.

222.    Because of the wrongful acts of Defendant City as alleged herein,
Plaintiffs have been and will be required to employ physicians to examine, treat and
care for them and will incur additional medical and economic damages in an amount to
be proven at the time of trial.

**COMPLAINT**

223.     In bringing this action, Plaintiffs have been required to retain the services of counsel and they are,  therefore, entitled to an award of attorney fees.

## THIRD CLAIM FOR RELIEF

### Racial Discrimination - Disparate Impact in Violation of 42 U.S.C. § 1983

### [As to all Plaintiffs]

224.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through  8  and 10 through 205 with the same force and effect as if fully pleaded at length herein.

225.     This is a claim to remedy egregious discrimination in violation of the Fourteenth Amendment to the United States Constitution.

226.     Defendant City has policies and practices within its workplace which, although facially neutral, of a disparate, negative impact on its Black employees.

227.     Said facially neutral policies and practices include, but are not limited to, the following:

      a.     Vesting managers with discretion to:

            1. select employees for paid job training opportunities;

            2. select employees for leadership positions that have not been posted; and

            3. Ignoring job pre-requisites such as degrees when considering Employees for promotional opportunities,

      b.     Posting of jobs as "re-assignments," limiting applications to employees currently in the job classification; and

      c.     Classification of employees in the Homeless and Supportive Housing Department.   Specifically, the highest classification available in that Department is "Health Worker III" and the "Health Worker IV" position is not available.  This ceiling on the classification of workers in

this particular limits the abilities of the employees therein to obtain promotion elsewhere in the Department of Public Works.

228.     Said facially neutral policies and practices have effects that have a disparate, negative impact on Black employees or applicants for employment.

229.     In order to permanently eradicate said discriminatory practices and to assure that they do not recur, Plaintiffs herein are seeking relief in the form of a permanent, mandatory injunction and such further equitable relief as the court deems necessary.

230.     As a result of the aforesaid acts of discrimination, Plaintiffs have suffered and are continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently un-ascertained and because they face substantial diminution of their future earning capacities Plaintiffs seek compensatory damages to make them whole.

231.     As a result of the effects of the aforesaid racial discrimination, Plaintiffs have been held up to great derision and embarrassment with fellow workers, friends, members of the community and families, and continue to suffer emotional distress because the Defendant demonstrated to the Plaintiffs that it would not recognize nor accept them as employees solely because of their race.  Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiffs therefore seek damages to compensate them for the effects of such emotional distress.

232.     In bringing this action, Plaintiffs have been required to retain the services of counsel and they are,  therefore, entitled to an award of attorney fees.

## FOURTH CLAIM FOR RELIEF

### Racial Discrimination - Retaliation in Violation of 42 U.S.C. § 1983

### [As to all Plaintiffs]

233.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 8 and 10 through 205 with the same force and effect as if fully pleaded at length herein.

234.     At all times herein relevant, Plaintiffs' job performance was always satisfactory and was usually excellent.

235.     This is a claim to remedy egregious discrimination in violation of the First and Fourteenth Amendment to the United States Constitution.

236.     At all times herein relevant, Defendant City has maintained and fostered a custom and practice within the Department of Public Health that permits managers to discipline, harass and take other actions to punish employees from opposing unlawful employment discrimination and to deter their coworkers from taking similar action. Said custom and practice has been aided and abetted by the personnel of the Department of Human Resources including, but not limited to, Director Micki Callahan.

237.     As alleged above, the Plaintiffs herein have complained of unlawful employment discrimination on numerous occasions by way of different means and in different forums. In response Defendant City has engaged in repeated and blatant acts of reprisal.

238.     Said acts of reprisal include, but are not limited to, the following:

a.     Opening investigations for purported (nonexistent misconduct), which often includes threatening to impose discipline. No conclusion to the Investigation is ever announced nor is any discipline ever imposed but the employee is never advised that the investigation has concluded;

b.     Transferring employees to unwanted assignments;

c.     During the time of the COVID-19 Pandemic, requiring employees to perform duties that management knew exposed them to infection;

d.     Ostracism;

e.    Denial of training;

f.    Assignment of employees with impossible duties (i.e., being required to perform two jobs at once);

g.    Imposition of unjustified discipline; and

h.    Refusal of requests to work from home during the COVID pandemic.

239.    The actions described in the preceding paragraph are reasonably likely to deter employees from engaging in protected activity.

240.    As a result of the aforesaid acts of reprisal, Plaintiffs have suffered and are continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently un-ascertained.  Plaintiffs face substantial diminution of their future earning capacities in an amount which is currently unascertained.  Plaintiffs will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

241.    As a result of the aforesaid reprisal, Plaintiffs have been held up to great derision and embarrassment with fellow workers, friends, members of the community and families, and continue to suffer emotional distress because the Defendant demonstrated to the Plaintiffs  that their protected activity would be punished severely. Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiffs therefore seek damages for such emotional distress in an amount to be proven at time of trial.

242.    In bringing this action, Plaintiffs have been required to retain the services of counsel and they are,  therefore, entitled to an award of attorney fees.

**FIFTH CLAIM FOR RELIEF**

**Disparate Treatment – Race/National Origin (Title VII)**

**(As to Plaintiff Daevu only)**

243.     Plaintiff Daevu incorporates by reference each of the facts alleged in paragraphs 1 through 8 and 120-130 as if fully pleaded at length herein.

244.     At all times relevant herein, the job performance of Plaintiff Daevu was always satisfactory and was usually excellent.

245.      Daevu was fully qualified for the position of Director of Equity, Social Justice and Multicultural Education and had qualifications superior to the individuals who were hired in her stead.  Said individuals did not belong to the relevant protected class.

246.     As a result of the wrongful conduct as described herein, Plaintiff Daevu has incurred economic losses. Plaintiff therefore seeks an award of back pay, front pay, and injunctive relief, according to proof at the time of trial.

247.     As a result of the unlawful disparate treatment as described herein, Plaintiff Daevu has been held up to great derision and embarrassment by her coworkers, friends, and members of the community. Plaintiff Daevu has suffered emotional distress because Defendant City has subjected her to disparate treatment on account of race and/or national origin. Plaintiff Daevu is informed and believes that City discriminated against her knowing that such discrimination would cause severe emotional distress. This Plaintiff therefore seeks damages for such emotional distress in an amount to be proved at the time of trial.

248.     In bringing this action, Plaintiff Daevu has been required to retain the services of counsel and is, therefore, entitled to an award of attorney fees.

### SIXTH CLAIM FOR RELIEF

**Employment Discrimination - Disparate Treatment in Violation of FEHA**

**Cal. Gov. Code § 12940(a)**

**[All Plaintiffs]**

249.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 205 with the same force and effect as if fully pleaded at length herein.

250.     Jurisdiction in this court is invoked pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"]. Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

251.     At all times herein relevant, Plaintiffs' job performance was always satisfactory and was usually excellent.

252.     There is and has been a long-standing, deep-rooted policy and practice of employment discrimination against its Black employees in the Department of Public Health Department, aided  and abetted by personnel within the Department of Human Resources, including but not limited to Micki Callahan. The purpose and effect of such policy is to limit the hiring and advancement of Black employees.

253.     Defendant City also has a deeply held policy and practice of discrimination against the Black clientele of the Department of Public Health.  Plaintiffs by advocating that service be provided to Black patients to the same extent as other members of the community have identified themselves with their Black patients and/or prospective patients.

254.     Said policies have resulted in a series of adverse employment actions against these Plaintiffs which include, but are not limited to:

    a.     Denial of necessary training;

    b.     Denial of training opportunities;

    c.     Denial of promotions;

    d.     Substandard performance reviews;

    e.     Denial permission to work from home;

f.     Increased work load;

g.     Being required to "work out of class," (i.e., perform

higher level work than called for in the official

job description but not receiving the pay at a level

commensurate with the level of work performed;

h.     Unjustified discipline; and

i.     Being required to perform hazardous work.

255.     The management of Defendant City knew of the racially discriminatory practices in the DPH generally and among the supervising managers specifically but, acting pursuant to the guidance of staff at the Department of Human Resources, took no remedial action or, if remedial action was attempted, it was insufficient and not supervised to assure compliance.

256.     The adverse employment actions alleged in paragraph 254 herein were and are continuing in character.

257.     As a result of the aforesaid acts of discrimination, Plaintiffs have suffered and are continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently un-ascertained.  Plaintiffs face substantial diminution of their future earning capacities in an amount which is currently unascertained.  Plaintiffs will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial

258.     As a result of the aforesaid racially disparate treatment, Plaintiffs have been held up to great derision and embarrassment with fellow workers, friends, members of the community and families, and continue to suffer emotional distress because the Defendant demonstrated to the Plaintiffs  that it would not recognize nor accept them as employees solely because of their race.   Defendant City acted

unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiffs therefore seek damages for such emotional distress in an amount to be proven at time of trial.

259.    In bringing this action, Plaintiffs have been required to retain the services of counsel. Pursuant to California Government Code § 12965(b), they are entitled to and hereby request an award of attorney and expert witness fees and costs of suit.

## SEVENTH CLAIM FOR RELIEF

### Age Discrimination - Disparate Treatment in Violation of FEHA

### Cal. Gov. Code § 12940(a)

### [All Plaintiffs]

260.    Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 205 with the same force and effect as if fully pleaded at length herein.

261.    Jurisdiction in this court is invoked pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"]. Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

262.    At all times herein relevant, Plaintiffs' job performance was always satisfactory and was usually excellent.

263.    Defendant City has a policy and practice of encouraging its managers to do everything within their power to remove older employees from their workplace and to preclude their further advancement.

264.    Said policy and practice has resulted in a series of adverse employment actions against these Plaintiffs which include, but are not limited to:

    a.    Denial of training opportunities necessary to advance;

    b.    Denial of Promotion in favor of younger, less qualified employees;

c.    Involuntary transfers;

d.    Deliberately assigning older employees tasks which are hazardous to their physical health and lives; and

e.    Pressuring older employees to retire.

265.    The management of Defendant City knew of the age based discriminatory practices in the DPH generally and among the supervising managers specifically but, under the guidance of staff at the Department of Human Resources took no remedial action or, if remedial action was attempted, it was insufficient and not supervised to assure compliance.

266.    The adverse employment actions alleged herein were and are continuing in character.

267.    As a result of the aforesaid acts of age discrimination, Plaintiffs have suffered and are continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently un-ascertained.  Plaintiffs face substantial diminution of their future earning capacities in an amount which is currently unascertained.  Plaintiffs will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

268.    As a result of the aforesaid disparate treatment based upon age, Plaintiffs have been held up to great derision and embarrassment with fellow workers, friends, members of the community and families, and continue to suffer emotional distress because the Defendant demonstrated to the Plaintiffs  that it would not recognize nor accept them as employees solely because of their race.  Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiffs therefore seek damages for such emotional distress in an amount to be proven at time of trial.

269.     In bringing this action, Plaintiffs have been required to retain the services of counsel. Pursuant to California Government Code § 12965(b), they are entitled to and hereby request an award of attorney and expert witness fees and costs of suit.

## EIGHTH CLAIM FOR RELIEF

### Racial Harassment in

### Cal. Gov. Code § 12940(j)

### [Plaintiffs Barros, Lynch, Hardy, Evans, Daevu, Thornton & James only]

270.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 130 and 159 through 205 with the same force and effect as if fully pleaded at length herein.

271.     Jurisdiction in this court is invoked pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"]. Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

272.     At all times herein Defendants City have created or allowed the creation of a hostile work environment based upon the race of these Plaintiffs and their association with each other and other members of the protected class.

273.     The acts giving rise to a racially hostile work environment include, but are not limited to, the following:

    a.  Ostracism of Black employees by their managers;

    b.  Public humiliation of Black employees;

    c.  Requiring Black employees to perform menial work below their job classifications;

    d.  During the time of the COVID-19 Pandemic, requiring Black employees to perform duties that management knew exposed them to infection; and

e.  Disrespecting and refusing to serve Black patients and clientele.

274.    Staff of Defendant City's Department of Human Resources also engaged in activity that had the purpose and effect of creating a racially hostile work environment through the use of racial slurs. Then, staff and management of Defendant City's Human Resources Department purported to investigate such incidents while suppressing the evidence of racial animus. Said suppression was known to responsible Human Resources Executive staff.

275.    Defendant City, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of race. Defendant, by and through its executives and managers, either knew about the hostile work environment and failed to take remedial action, or themselves created a hostile work environment based on race.

276.    As a result of the hostile work environment as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendant City has subjected them to a racially hostile work environment. Plaintiffs are informed and believe that Defendant City maintained such a racially hostile work environment, knowing that it would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proved at the time of trial.

277.    Because of the wrongful acts of Defendant City as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an amount to be proven at the time of trial.

278.    In bringing this action, Plaintiffs have been required to retain the services of counsel. Pursuant to California Government Code § 12965(b), they are entitled to and hereby request an award of attorney and expert witness fees and costs of suit.

### NINTH CLAIM FOR RELIEF

**Age Harassment**

**Cal. Gov. Code § 12940(j)**

**[Plaintiffs Barros, Daevu, & Thornton]**

279.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 38, 120 through 130 and 171 through 205 with the same force and effect as if fully pleaded at length herein.

280.     Jurisdiction in this court is invoked pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"]. Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

281.     At all times herein relevant Defendants City have created or allowed the creation of a hostile work environment based upon the age of these Plaintiffs. The purpose and effect of such acts was to communicate to these Plaintiffs that as older employees they were not welcome within the work site.

282.     The acts giving rise to a racially hostile work environment include, but are not limited to, the following:

   a.   Assigning Plaintiffs to perform hazardous tasks during the COVID pandemic which management of DPH management knew put Plaintiffs at risk of becoming ill;

   b.   Pressuring Plaintiffs to retire;

   c.   Threatening to fire Plaintiffs;

   d.   Assigning Plaintiffs menial and humiliating tasks to perform; and

   e.   Public humiliation.

283.     Defendant City, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of race. Defendant, by and through its

executives and managers, either knew about the hostile work environment and failed to take remedial action, or themselves created a hostile work environment based on race.

284. As a result of the hostile work environment as described herein, Plaintiffs have been held up to great derision and embarrassment by their fellow coworkers, friends, and members of the community. Plaintiffs have suffered emotional distress because Defendant City has subjected them to a racially hostile work environment. Plaintiffs are informed and believe that Defendant City maintained such a racially hostile work environment, knowing that it would cause severe emotional distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proved at the time of trial.

285. Because of the wrongful acts of Defendant City as alleged herein, Plaintiffs have been and will be required to employ physicians to examine, treat and care for them and will incur additional medical and economic damages in an amount to be proven at the time of trial.

286. In bringing this action, Plaintiffs have been required to retain the services of counsel. Pursuant to California Government Code § 12965(b), they are entitled to and hereby request an award of attorney and expert witness fees and costs of suit.

## TENTH CLAIM FOR RELIEF

### Failure to Prevent Employment Discrimination & Harassment

### Cal. Gov. Code § 12940(k)

### [By All Plaintiffs]

287. Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 205 with the same force and effect as if fully pleaded at length herein.

288. Jurisdiction in this court is invoked pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"].

Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

289.    It is unlawful for an employer in the State of California to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

290.    Defendant City was and is well aware of its obligations to prevent racial discrimination in its workplace.  However, rather than take action to stop race discrimination in hiring, advancement and compensation, it has taken actions that appear *aimed* to accomplish such goals, such as the convening of commissions, task forces and work groups but in fact are designed to nothing but to make it appear the City is attempting to end race discrimination in its work places when in fact it is not. The purpose of such "commissions, task forces and work groups" is and was fraudulent, a fact that these Plaintiffs and other Blacks employed by Defendant City can attest.

291.    The fraudulent purposes of the myriad "commissions, task forces and work groups" was pursued with vigor by the Department of Human Resources with the connivance of other City Departments, including – as relevant in this case – the Department of Public Health.

292.    Plaintiffs and other Blacks have repeatedly and persistently complained to Defendant City about racial discrimination and harassment in the work place. In response, has come mealy mouthed platitudes and referrals to fraudulent "commissions, task forces and work groups" but no action to assure equality of opportunity and a work place free of racial hostility.

293.    Notwithstanding the facts stated in paragraph 290, supra, Defendant City has not taken the steps necessary to prevent racial discrimination and harassment in the workplace.  Evidence of this failure is seen in the repeated and continuing refusal to promote qualified Blacks.

294.      As a result of the failure by Defendant City to prevent racial discrimination and harassment, Plaintiffs have suffered and are continuing to suffer a loss of wages/salary, benefits, and other forms of compensation in an amount which is currently unascertained.  Plaintiffs will therefore request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

295.      As a result of the aforesaid failure to prevent racial discrimination and harassment, the Plaintiffs have been held up to great derision and embarrassment with their fellow workers, customers, friends,  members of the community and families, and have suffered emotional distress because Defendant City  has demonstrated to them that it would not recognize nor accept them as employees solely because of their race. Plaintiffs are informed and believe that the Defendant and the management of the Department of Human Resources and Public Health acted deliberately for the purposes of injuring them as alleged above. Defendant City by and through its executives and managers further acted intentionally and unreasonably because they knew and/or should have known that their failure to prevent racial discrimination and harassment was likely to result in severe mental distress. Plaintiffs therefore seek damages for such emotional distress in an amount to be proven at time of trial.

296.      In bringing this action, Plaintiffs have been required to retain the services of counsel. Pursuant to California Government Code § 12965(b), they are entitled to and hereby request an award of attorney and expert witness fees and costs of suit.

## ELEVENTH CLAIM FOR RELIEF

### Retaliation -FEHA

### Cal. Gov. Code § 12940(h)

### [By All Plaintiffs]

297.     Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 205 with the same force and effect as if fully pleaded at length herein.

298.     Jurisdiction in this court is invoked pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"]. Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

299.     At all times herein relevant, Plaintiffs' job performance was always satisfactory and was usually excellent.

300.     Plaintiffs, each of them, opposed the unlawful racial discrimination and by Defendant City on multiple occasions.

301.     At all times herein relevant, Defendant City has maintained and fostered a  custom and  practice within the Department of Public Health that  permits managers to discipline, harass and take other actions to punish employees from opposing unlawful employment discrimination and to deter their coworkers from  taking similar action.  Said custom and practice has been aided and abetted by the personnel of the Department of Human Resources including, but not limited to, Director Micki Callahan.

302.     As alleged above, the Plaintiffs herein have complained of unlawful employment discrimination on numerous occasions by way of different means and in different forums.  In response Defendant City has engaged in repeated and blatant acts of reprisal.

303.     Said acts of reprisal include, but are not limited to, the following:

a.     Opening investigations for purported (nonexistent misconduct), which often includes threatening to impose discipline.  No conclusion to the Investigation is ever announced nor is any discipline ever imposed but the employee is never advised that the investigation has concluded;

b.    Transferring employees to unwanted assignments;

c.    During the time of the COVID-19 Pandemic, requiring

employees to perform duties that management knew exposed \

them to infection;

d.    Ostracism;

e.    Denial of training;

f.    Assignment of employees with impossible duties (i.e.,

being required to perform two jobs at once);

g.    Imposition of unjustified discipline; and

h.    Refusal of requests to work from home during the COVID pandemic.

304.    As a result of the aforesaid acts of retaliation, Plaintiffs have suffered and are continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently unascertained.   Plaintiffs will request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

305.    As a result of the aforesaid retaliation, Plaintiffs have been held up to great derision and embarrassment with fellow workers, friends, members of the community and family, and continues to suffer emotional distress because Defendant City has demonstrated to the Plaintiffs  that it would not recognize nor accept their rights as employees because,  rather than ceasing to engage in unlawful employment practices, instead it engaged in reprisal.  Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiffs therefore seek damages for such emotional distress in an amount to be proven at time of trial.

306.    Because of the wrongful acts of Defendant County as herein above alleged, Plaintiffs has been and will in the future be required to employ physicians and

surgeons to examine, treat and care for them and will incur additional medical expenses in an amount to be proven at the time of trial.

307.   In bringing this action, Plaintiffs have been required to retain the services of counsel. Pursuant to California Government Code § 12965(b). They are entitled to and hereby requests an award of attorney and expert witness fees and costs of suit.

## TWELFTH CLAIM FOR RELIEF

### Retaliation for Medical Whistleblowing

### Calif Health and Safety Code § 1278.5

### [By Plaintiffs Barros, Lynch, Evans, & Thornton only]

308.   Plaintiffs incorporate by reference all of the allegations contained in paragraphs 1 through 8, 18 through 66, 94 through 119, and 171 through 205 with the same force and effect as if fully pleaded at length herein.

309.   Jurisdiction in this court is invoked pursuant to California Health & Safety Code § 1278.5.

310.   The Plaintiffs herein were at all times herein relevant employed at a health facility as defined by the California Health and Safety Code.

311.   Plaintiffs' job performance was satisfactory and was usually excellent.

312.   Plaintiffs' each separately complained to the management of Defendant City regarding the care and service provided patients in health facilities operated by said Defendant.

313.   Plaintiff Thornton complained of, among other things, unsafe patient care to an external agency of the State of California.

314.   Each of the Plaintiffs herein suffered discriminatory treatment as a result of their complaints of unsafe patient care.

315.   Pursuant to the provisions of Health & Safety Code § 1278.5(g), Plaintiffs are entitled to the recovery of all lost income as a result of the wrongful acts alleged herein,

316.   As a result of the aforesaid acts of discriminatory treatments, Plaintiffs have been held up to great derision and embarrassment with their fellow employees, friends, patients, members of the community and family. Plaintiffs suffered and continue to suffer emotional distress because Defendant City demonstrated to them that it would not tolerate them as employees solely because they complained of matters pertaining to patient health and safety.   Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiffs therefore seek damage for such emotional distress in an amount to be proven at time of trial.

317.   In bringing this action, Plaintiffs have been required to retain the services of counsel and they are,  therefore, entitled to an award of attorney fees.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment as against Defendants, and each of them, as follows:

(1)   Compensatory damages according to proof;

(2)   Emotional distress damages according to proof;

(3)   Back pay as to Plaintiff Daevu;

(4)   Front pay as to Plaintiff Daevu;

(5)   Lost income according to proof, pursuant to Health & Safety Code § 1278.5 (g), as to Plaintiffs Barros, Lynch & Thornton;

(6)   Injunctive Relief;

(7)   Punitive and exemplary damages according to proof;

(8)     Reasonable Attorney fees;

(9)     Expert witness fees pursuant to California Gov Code § 12965(b); and

(10)    Costs of Suit;

(11)    Such other further relief as the Court may grant.


Date: October 20, 2020                          **LAW OFFICES OF JOSEPH L.**

                                                **ALIOTO & ANGELA ALIOTO**



                                                Angela Alioto
                                                *Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues triable as a right by jury.

Date: October 20, 2020

**LAW OFFICES OF JOSEPH L. ALIOTO & ANGELA ALIOTO**

Angela Alioto
*Attorneys for Plaintiff*